IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 9, 2008

**MICHAEL SKINNER v. KAREN THOMAS.**

**Appeal from the Circuit Court for Williamson County**
**No. 95422    Jeffery S. Bivins, Judge**

---

**No. M2007-01583-COA-R3-CV - Filed December 11, 2008**

---

This is a post-divorce case where Father petitioned for modification of the child custody order based on alleged material change in circumstances. The Williamson County Circuit Court partially granted the petition finding a material change in circumstances, but that a change in custody from Mother to Father was in the best interest of only one of the children, leaving custody of the other child with Mother. Both Father and Mother assert error by the trial court. We affirm in part, reverse in part and remand this case for further proceedings.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in part, Reversed in part and Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., J., joined. PATRICIA J. COTTRELL, P. J., M. S., not participating.

Jon Steven Jablonski, Nashville, Tennessee, for the appellee, Karen Thomas.

Phillip Edward Schell, Franklin, Tennessee, for the appellant, Michael Skinner.

**OPINION**

Dr. Michael Skinner ("Father") and Karen Thomas ("Mother") were divorced in 1997; they are the parents of three children born during the marriage. At the time of trial, the oldest had reached the age of majority, the middle child was 16 and the youngest was 12. When the parties' divorced, Mother was named the primary residential parent and Father received standard visitation consisting of every other weekend, one night each week, split holidays and two weeks in the summer with the three children.

In 1998, Father married Stephanie Skinner; they have been married for ten years and have two children born during their marriage. By all accounts, they have a stable home and marriage and Father has significantly improved his parenting skills and involvement in his children's lives. Since the divorce from Father, Mother married and, subsequently, divorced Dr. Cliff Myles and is currently

married to Scott Thomas, although they have been separated since January 2006. All of Mother's marriages were tumultuous; her marriage to Dr. Myles resulted in the police being called to Mother's house in 1999 and 2002 for domestic violence.

In 1999, conflict over visitation and co-parenting between Mother and Father escalated; the trial court found Mother in contempt for interfering with Father's visitation and appointed Dr. David McMillan, a clinical psychologist, to conduct a custody evaluation.[1] Mother wanted her then current husband, Dr. Myles, to adopt the children, although she later changed her mind; she frequently used Myles as the children's last name. Dr. McMillan recommended at the time that Father give up his parental rights because the conflict with Mother was so intense and because Father had yet to establish himself as a dependable parental figure. Father was adamant that he did not want to give up his parental rights; however, he did agree to reduce his visitation in exchange for a reduction in his child support obligation.[2] As a result, the trial court entered an Agreed Order in April 2000, which reduced Father's visitation to one weekend per month and one week during the summer and reduced his child support obligation from $5,500 per month to $5,000 per month; the order also transferred the burden of paying for the children's college education from Father to Mother with the stipulation that if Father ever sought to increase his visitation he would resume the obligation of paying for the children's college education.[3] Neither Father, Dr. McMillan, nor the court was aware of the domestic violence between Mother and Dr. Myles at the time.

Since 2000, Father sought Dr. McMillan's advice in dealing with the parties' two oldest children as they reached adolescence and began to exhibit behavior problems. In 2004, Father contacted Dr. McMillan because he was concerned about the increasing level of conflict between Mother and the parties' oldest child just before she turned 16. There was at least one incident where Mother was angry at her for staying at one friend's house when she told Mother she would be at a different friend's house; Mother drove her to Father's house, told her to get out of the car in the rain and then threw her books in a puddle of mud. The child was crying and told Father that she hated Mother and that Mother had tried to make her say things in court about Father that were not true; Father took the child to see Dr. McMillan who spoke with her for about 40 minutes. Father again contacted Dr. McMillan in 2006, because the parties' middle child was starting to act out in the ways the older child had when she was the same age. Dr. McMillan gave Father some advice on parenting adolescents, but told Father that in order to work through the child's issues both Mother and Father should come with her to his office; Father asked Mother twice to make the appointment, but she did not.

---

[1] The contempt charge was apparently later withdrawn, but the court proceedings explaining the circumstances of the original contempt order and subsequent withdrawal are not in this record.

[2] Father testified at trial that he did not want to reduce his visitation, but that Mother was making any visitation very difficult for Father and Father was under other financial pressures with Mrs. Stephanie Skinner pregnant with their first child and his dental practice on the verge of bankruptcy.

[3] The April 2000 Order was omitted from the record, but there is no dispute that it is this Order that this action seeks to modify.

Starting around 2004-2005, Father's relationship with the children, particularly the older two, began to improve. This was around the time that the oldest child received her driver's license and a car; she testified that she began to stay away from Mother's home as much as possible in order to avoid conflict with Mother. The oldest child began spending extra time at her Father's home including baby-sitting his two youngest children, completing chores around his house, and staying overnight during the week and extra weekends. Sometimes the oldest child would bring the middle child with her when she visited Father, but they would not tell Mother because she would get angry with them and make them feel guilty for wanting to spend time with Father.

In the summer of 2006, Father came to believe that Mother was no longer suitable as the primary residential parent. He learned for the first time about the high level of chaos and tension in Mother's home and, in particular, about the domestic violence the children had observed between Mother and Dr. Myles when they were married. Father was also concerned by several incidents between Mother and the middle child that culminated in Mother filing an unruly petition against her in Williamson County Juvenile Court.[4] Father petitioned to modify custody on August 6, 2006, seeking to be named the primary residential parent of the parties' three children.[5] Father alleged there was a material change in circumstances; that Mother was routinely unable or unwilling to properly supervise the children and was physically abusive with at least one of the children; that she spoke badly of Father and his wife; and that she was in need of psychological counseling, treatment and possibly medication to deal with her behavioral issues. The court again appointed Dr. McMillan to evaluate the family with regard to this petition because of his prior involvement and familiarity with the family.

Dr. McMillan concluded that while Father had not always been a strong parent, he had always provided for the children financially and his parenting skills had improved with the help and support of his current wife. Since the April 2000 Agreed Order, Father had paid $5,000 per month in child support as well as provided the children's health insurance; he bought them clothes, took them out to eat and on vacation. Father also paid the children's private school tuition at an amount equal to that charged by the private school they attended when they were younger.

---

[4] One incident involved Mother screaming and cursing at several individuals at the child's driving school. The juvenile court incident was precipitated by an exchange between Mother and the child over the July 4 weekend revolving around whether she could stay overnight with a friend. Mother had given her permission to stay over for an additional night, but then reversed that decision, then reversing yet again permitting the child to stay, and then changed her mind yet again. Apparently when Mother called the child the last time to tell her to come home the child's cell phone was on speaker phone and Mother said some derogatory things about her friend and her friend's mother while they were in the room, which embarrassed the child. Later that same day, the child apparently went to the Mall instead of returning home and Mother went there to find her. When Mother found her she ordered her to get into the car; the child was yelling at Mother and Mother reached into the backseat to "silence" her; in so doing she grabbed her leg which resulted in a bruise. From there Mother drove the child to Juvenile Court where she filed an Unruly Petition. The Juvenile Court held a hearing, which Father was unable to attend, and the child was ordered to stay one night in juvenile detention and then remain under home detention for one month.

[5] In as much as the parties' oldest child had reached 18 at the time of trial, the final order does not address custody of her.

Dr. McMillan's evaluation also concluded that Mother had been a very good parent when the children were young, but that she struggled to create an authority structure as the children reached adolescence. Mother enmeshed the children in her personal life and she sought to please them at any cost. Mother and the children constantly engaged in sibling-like fights and Mother would often bargain with the children to win their affection. When she did punish one of the children for bad behavior the child would easily manipulate her and negotiate out of the punishment. Dr. McMillan determined that the children were Mother's whole world and she had not developed an identity that was separate from them; she only occasionally held part-time jobs and relied extensively on the children for moral support through her three disastrous marriages. Dr. McMillan observed that Mother often provided the children with inappropriate details about her personal problems. The children reported to Dr. McMillan and in their testimony at the hearing that Mother told them she wished Father were dead or that he should "burn in hell" and that Mother often made the children feel guilty about wanting to see and spend time with Father, often calling them "traitors," which led the children to be dishonest with Mother. It was apparent to Dr. McMillan that when the children were young they did not trust Father, but as they got older they began to develop their own independent views of him and began wanting to spend more time with him and his current wife. The children also reported to him that on at least one occasion Father's current wife took the girls shopping and the oldest child told the youngest child to tell Mother that she had bought the clothes and not Father's wife so that Mother would not get angry and throw the clothes away.

After several days of trial with twenty witnesses including Mother, Father, Dr. McMillan and all three children as well as family, friends, and school officials, the trial court found there had been a material change in circumstances; however, the court found that a change in custody from Mother to Father was in the best interest of only the middle child, leaving the youngest child in the primary care of Mother. Father appeals asserting error with regard to the court's finding that a change in custody was not in the best interest of the youngest child. Mother asserts error with regard to the court's finding that there was a material change in circumstances and that a change in custody was in the middle child's best interest. Mother also appeals the amount of child support she is to receive. Both parties appeal the trial court's order requiring each party to pay their own attorney fees.

## STANDARD OF REVIEW

We review the trial court's conclusions of law "under a pure *de novo* standard of review, according no deference to the conclusions of law" made by the trial court. *Kendrick v. Shoemake*, 90 S.W.3d 566, 569-70 (Tenn. 2002); *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). A "review of findings of fact by the trial court in civil actions shall be *de novo* upon the record, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); *Kendrick*, 90 S.W.3d at 570.

In applying the *de novo* standard, "we are mindful that '[t]rial courts are vested with wide discretion in matters of child custody' and that 'the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion.'" *Johnson v. Johnson*, 169 S.W.3d 640, 645 (Tenn. Ct. App. 2004) (quoting *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993)).

-4-

"Because '[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during...proceedings themselves,' appellate courts 'are reluctant to second-guess a trial court's decisions.'" *Johnson*, 169 S.W.3d at 645 (quoting *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1993)).

## ANALYSIS

### I. Waiver of Issue On Appeal

Mother asserts that Father's brief to this court fails to "state the alleged erroneous action of the trial court which raises the issue and fails to show how such alleged error was seasonably called to the attention of the trial judge...." Mother cites Rule 6 of the Rules of the Court of Appeals of Tennessee as well as *Bell v. Bell*, No. M2004-01975-COA-R3-CV, 2007 WL 2095422 at *2-3 (Tenn. Ct. App. July 18, 2007), in support of this assertion.[6] Mother further asserts that she preserved her issues on appeal by filing a Motion to Alter or Amend, or in the Alternative Motion for a New Trial.

Tenn. R. App. P. 3(e) requires the filing of a Motion for New Trial before an appeal in a jury trial can be made to a higher court. Tenn. R. App. P. 3(e); *McCormic v. Smith*, 659 S.W.2d 804, 805 (Tenn. 1983). This rule states that:

> ...in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

---

[6] Rule 6 of the Rules of the Court of Appeals of Tennessee states:

(a) Written argument in regard to each issue on appeal shall contain:
(1) A statement by the appellant of the alleged erroneous action of the trial court which raises the issue and a statement by the appellee of any action of the trial court which is relied upon to correct the alleged error, with citation to the record where the erroneous or corrective action is recorded.
(2) A statement showing how such alleged error was seasonably called to the attention of the trial judge with citation to that part of the record where appellant's challenge of the alleged error is recorded.
(3) A statement reciting wherein appellant was prejudiced by such alleged error, with citations to the record showing where the resultant prejudice is recorded.
(4) A statement of each determinative fact relied upon with citation to the record where evidence of each such fact may be found.
(b) No complaint of or reliance upon action by the trial court will be considered on appeal unless the argument contains a specific reference to the page or pages of the record where such action is recorded. No assertion of fact will be considered on appeal unless the argument contains a reference to the page or pages of the record where evidence of such fact is recorded.

Tenn. R. App. P. 3(e).  The Tennessee Supreme Court in *McCormic v. Smith*, 659 S.W.2d 804 (Tenn. 1983) reaffirmed that Tenn. R. App. P. 3(e) applies only to cases tried by a jury. *McCormic*, 659 S.W.2d at 806.  The Court further stated that precedent "does not...stand for the proposition that all errors of the trial judge...must be brought back for further consideration by the trial court on a motion under Rule 59, T.R.C.P. before such issues can be considered on appeal." *Id.*

The present case was tried before a chancellor without the presence of a jury.  Based on Tenn. R. App. P. 3(e), Father was not required file a motion for new trial as a prerequisite to appeal. Furthermore, the *Bell* case relied upon by Mother is inapplicable as that case involved a party attempting to appeal a trial court's Final Decree of Divorce after failing to appear at the trial in person or through counsel.  *Bell*, No. M2004-01975-COA-R3-CV, 2007 WL 2095422 at *2.  In rejecting the appeal, the court relied on Rule 36 of the Tennessee Rules of Appellate Procedure which provides that an appellate court is not required to grant relief to a party responsible for an error or who failed to take reasonable action to prevent or nullify the harmful effort of an error.  Finally, while Father's argument section of his original Brief failed to include citations to the record, the fact section contained complete citations to the record; moreover, this error was largely corrected in his Reply Brief.  Therefore, we will review Father's issues on appeal in order to expedite a decision upon the matter pursuant to Rule 1 of the Rules of the Court of Appeals of Tennessee.[7]

## II.  Modification of Custody

### A.  Standard for Modifying a Custody Order

Because children are more likely to thrive in a stable environment, the courts favor maintaining existing custody arrangements.  *Taylor v. Taylor,* 849 S.W.2d 319, 332 (Tenn. 1993); *Kellett v. Stuart*, 206 S.W.3d 8, 14 (Tenn. Ct. App. 2006); *Hoalcraft v. Smithson,* 19 S.W.3d 822, 828 (Tenn. Ct. App. 1999).  A valid custody order or residential placement schedule, once entered by the court, is *res judicata* as to the facts in existence or reasonably foreseeable when the decision was made.  *Keisling v. Keisling*, 196 S.W.3d 703, 719 (Tenn. Ct. App. 2005); *Hoalcraft,* 19 S.W.3d at 828.

Nonetheless, a custody and visitation order, or the residential schedule in a permanent parenting plan, may be modified in certain situations.  Such an order remains within the control of the court and is subject to "such changes or modification as the exigencies of the case may require." Tenn. Code Ann. § 36-6-101(a)(1).  Both the legislature and the courts have addressed the requirements for such a modification, in recognition of the fact that the circumstances of children and their parents change, sometimes requiring changes in the existing parenting arrangement.  When a petition to change custody is filed, the parent seeking the change has the burden of showing that

---

[7] Rule 1 of the Rules of the Court of Appeals of Tennessee permits "for good cause, including the interest of expediting a decision upon any matter, this Court . . . [to] suspend the requirements or provisions of any of these rules in a particular case on motion of a party, or on its own motion, and may order proceedings in accordance with its discretion."

a material change in circumstances has occurred which makes a change in custody in the child's best interest. *Blair v. Badenhope,* 77 S.W.3d 137, 148 (Tenn. 2002); *In re M.J.H.,* 196 S. W.3d 731, 744 (Tenn. Ct. App. 2005); *In re Bridges*, 63 S.W.3d 346, 348 (Tenn. Ct. App. 2001).

A decision on a request for modification of a parenting arrangement requires a two-step analysis. *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003). A party petitioning to change an existing custody order must prove both (1) that a material change of circumstances has occurred and (2) that a change of custody or residential schedule is in the child's best interest. *Kendrick*, 90 S.W.3d at 575. Only after a threshold finding that a material change of circumstances has occurred is the court permitted to go on to make a fresh determination of the best interest of the child. *Kendrick*, 90 S.W.3d at 569; *Badenhope*, 77 S.W.3d at 150; *Curtis v. Hill*, 215 S.W.3d 836, 840 (Tenn. Ct. App. 2006).

As to the first requirement, *i.e.*, a material change of circumstances, the Tennessee Supreme Court has stated:

> Although there are no bright line rules as to whether a material change in circumstances has occurred after the initial custody determination, there are several relevant considerations: (1) whether a change has occurred after the entry of the order sought to be modified; (2) whether a change was not known or reasonably anticipated when the order was entered; and (3) whether a change is one that affects the child's well-being in a meaningful way.

*Cranston*, 106 S.W.3d at 644 (citing *Kendrick*, 90 S.W.3d at 570).

The General Assembly has also addressed the question of what constitutes a material change of circumstances:

> (B) If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.
>
> (i) In each contested case, the court shall make such a finding as to the reason and the facts that constitute the basis for the custody determination.

Tenn. Code Ann. § 36-6-101(a)(2)(B).

Only if a material change of circumstances is shown to exist is the trial court allowed to proceed to the next step of the analysis: whether modification of the existing parenting arrangement

is in the child's best interest. *Cranston*, 106 S.W.3d at 644; *Kendrick*, 90 S.W.3d at 569; *Curtis*, 215 S.W.3d at 840. That determination requires consideration of a number of factors, including those set out in Tenn. Code Ann. § 36-6-106(a) (factors to consider in custody determination). *Kendrick*, 90 S.W.3d at 570.

The factors to be considered in the second step of the analysis that fall under Tenn. Code. Ann. § 36-6-106(a) include:

(1) The love, affection and emotional ties existing between the parents and child;

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that where there is a finding, under § 36-6-106(a)(8), of child abuse, as defined in §§ 39-15-401 or 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a non-perpetrating parent has relocated in order to flee the perpetrating parent, that such relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7)(A) The reasonable preference of the child if twelve (12) years of age or older; (B) The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse, as defined in §§ 39-15-401 or 39-15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(a).

## B. Application of the Standard

The first step of our analysis requires a review of the alleged changed circumstances to determine if they are material and unforseen. We review the trial court's findings of fact *de novo* with a presumption of correctness, but we review its conclusions of law based on those facts *de novo* with no presumption of correctness. *Kendrick*, 90 S.W.3d at 570. The trial court found:

[T]here to be a material change of circumstances in this case. And particularly the Court notes that although [Mother] has to some extent remedied past bad relationships, there does appear in the Court's mind to be a pattern of somewhat chaotic and disruptive personal relationships involved, be it through both of her subsequent marriages....

In the Court's mind the greatest concern of this Court is [Mother's] continuing refusal to foster the relationship between the children and [Father]. The record is replete from several witnesses of instances in which [Mother] continues to speak badly of [Father], to speak badly of [Father's] new – well, not new wife now, but the current wife . . . . And continues to berate him and call him names. This is something this court cannot tolerate. And [Mother's counsel] has made a very good argument to the Court in that his argument that this is really not a change of circumstances because this is simply – has been going on through this relationship. And while it is true, the Court finds that that obviously has been going on throughout the relationship, if the Court were to accept that argument it would be accepting an argument that this Court cannot expect compliance with its previous orders once they are entered.

In this situation, with the original custody order, with the agreed order of April 2000, and with any order this Court enters regarding child custody matters, it is assumed and expected and required by this Court that both parents foster a good relationship with the other parent. And it is required that they particularly take no steps toward demeaning or making derogatory comments on a consistent basis about the other. For all of those reasons in combination the Court does conclude that there has been a material change of circumstances in this case.

-9-

Mother asserts that the trial court erred by considering Mother's circumstances; she contends that courts may only look to the child's circumstances, not the parents', in order to find there has been a material change in circumstances since the entry of the last Order. The circumstances that most concerned the trial court here for the purposes of determining a change in circumstances were Mother's inability to adapt her parenting skills to deal with the children as they became adolescents, Mother's interference with Father's ability to develop a meaningful relationship with his children and the chaotic and disruptive personal relationships in which Mother enmeshed the children. The trial court properly considered Mother's change in circumstances as those particular circumstances affected the children's well-being. As the *Kendrick* court noted in its discussion of the factors for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody, "a parent's change in circumstances may be a material change in circumstances for the purposes of modifying custody if such a change affects the child's well-being." *Kendrick*, 90 S.W.3d at 570. The trial court heard expert testimony from Dr. McMillan on the ill-effects of Mother's inappropriate parenting techniques. Mother's cajoling and bargaining with the children led them to not respect Mother and manipulate her to get out of punishments. Mother's tendency to provide the children with too much adult information about her personal relationships resulted in them seeing and treating Mother as a sibling rather than authority figure.

Mother contends that many of these issues of concern for the trial court were present in 1999 and 2000 when the agreed order was entered and, therefore, are not a change in circumstance. The issue of Mother's ability to properly parent adolescent children was clearly a change since the entry of the April 2000 agreed order, as Mother was by all accounts a "very good" parent to the children when they were younger; however, she continued to use techniques for younger children such as coddling and bargaining as the children grew into adolescence rather than establishing and enforcing consequences within a respectful, structured environment. While the latter two matters may have existed back in 1999 and 2000, Mother's chaotic and disruptive personal relationships were not the subject of proof in that proceeding. With regard to Mother's speaking badly of Father, the court operates under the assumption that parties will abide by its orders requiring the parents to foster a good relationship with the other parent. Those matters were not known or reasonably anticipated by the court at the time the agree order was entered in April 2000. Therefore, we affirm the trial court's finding of a material change in circumstances.

The second step of our analysis requires a review of the trial court's determination of whether the modification of child custody was in the best interest of the children. The trial court found that factors (1), (5), and (9) were neutral neither favoring Mother or Father; factors (2) with regard to both children and (6) and (7) with regard to the youngest child favored Mother; and factors (3), (4), (8) and (10) with regard to both children and (6) and (7) with regard to the middle child favored Father. We will discuss the trial court's determination with respect to each child separately as the court found that modification to be in the best interest of one, but not the other.

### 1. Custody of the Middle Child

Mother asserts that the trial court erred in changing custody of the parties' middle child from Mother to Father because "[her] best interest is not served by the Permanent Parenting Plan entered by the Court on July 3, 2007." Mother relies on testimony by Mother's friends and neighbors that the children are polite and well-behaved to show that despite her troubled marriages and personal problems that she "has still raised three fine young women." While the trial court found the children to be polite, their lives have not been without difficulty. All three children testified to constant arguing and raised voices in Mother's home – between Mother and her ex- and current husbands and between Mother and the children. They also testified that Mother often curses at them and at others in their presence. The level of anger and disrespect that Mother allows the children to show her has certainly not been without repercussion as the two older children both developed behavior problems around the age of 14. Dr. McMillan testified that the older child was raised by Mother until she reached the age of 14 and then raised herself; at the age of 16 she began spending as much time away from Mother's house as possible, including spending extra days and nights at Father's house. The middle child's behavioral problems appear to be more drastic than the older child's, resulting in Mother filing an unruly petition in Juvenile court against her.

The trial court found that, based on the totality of the evidence and upon consideration of the statutory factors, it was in the best interest of the middle child that custody be changed to Father. In particular, the trial court found that Father appeared to be better able to control her than Mother. *See* Tenn. Code. Ann. § 36-6-106(a)(6). The court appointed psychiatrist, Dr. McMillan, believed this child presented a great challenge to any parent, but that Mother in particular was ill-equipped to deal with her; Mother's lack of boundaries and enmeshment with her children resulted in an inability to provide the authority structure that she needed. *Id.* The court found that the stability of the family unit with Father and Father's current wife appeared to be strong at this point in contrast with Mother's household. *Id*. § (a)(4). The court was "very concerned" about whether the children were living in a "stable and satisfactory environment" and was particularly troubled by the deteriorating relationship between the middle child and Mother. *Id.* § (a)(3). While the court did not believe Mother's actions rose to the level of emotional abuse, the court found that she "failed and refused to encourage a close and continuing parent/child relationship between [the children] and [Father] and [Father's current wife]" including calling them names and calling the children "traitors" for wishing to spend time with them. *Id.* § (a)(8), (10). Contrasting with Mother's behavior, the court noted that Father and Father's current wife encouraged the children to have a continuing and strong relationship with Mother. *Id.* The middle child did not wish to express a preference in this matter, but the court deduced from her testimony that, in all likelihood, she would prefer to live primarily with Father. *Id.* § (a)(7). Finding no error, we affirm the trial court's determination that a change in custody from Mother to Father is in the middle child's best interest.

### 2. Custody of the Youngest Child

Father asserts that the trial court erred in not changing custody of the parties' youngest child from Mother to Father because the same factors that lead the trial court to change the custody of the

middle child existed for the youngest child and the trial court failed to articulate sufficient reason for leaving her in the care of Mother.

The trial court found that the best interest of the youngest child to be a "close call" and acknowledged that its conclusion to grant custody to different parents with regard to different children was "rare for this Court to do, as it should be." The court was most concerned about "the fragile state of [youngest child] at this point and her strong emotional ties to her mother." The court further explained its decision:

> The Court recognizes Dr. McMillan's red flag for that very reason and is concerned about the fact that [Mother], as Dr. McMillan points out, appears to be a wonderful mother as these children are younger children, but tends to have problems with these children as they grow older and the relationship begins to deteriorate. There clearly is no ill will and intent in the Court's finding with [Mother] with that regard. However, it is a fact. And while the Court is not ready to change custody of [the youngest child] at this point in time, the Court does note for the record for [Mother's] consideration that this Court is very concerned about that relationship, and is concerned about [Mother's] desire to give these children everything at the cost of appropriate discipline in many instances.

> It appears to the Court that as these children become older that [Mother] does not – wishes for their relationship to remain the same as it was. And unfortunately for all of us as parents, that simply cannot be. And while this Court struggles with the issue of [the youngest child], again, because of the strong emotional ties, at this point in time the Court does not feel that it is appropriate to change custody with regard to [the youngest child].

Dr. McMillan testified that while the youngest child had good things to say about Father, she was very frightened to talk and was the most fragile of the children. In explaining her fragility, Dr. McMillan said that she was "very, very connected" to Mother and often slept with Mother. *See* Tenn. Code. Ann. § 36-6-106(a)(1), (7). In the family dynamic, she is Mother's apologist to the other children and takes on Mother's version of reality. *Id.* Dr. McMillan noted that the same was true of the two older children when they were this child's age. Dr. McMillan explained that Mother was very dependent on her role as mother and did not know how to separate her own identity from the children. This put a lot of pressure on the children and he warned that, with the two older children growing up and not being around the house much anymore, Mother was likely to put all of this pressure on the youngest child, which could be disastrous for her. *Id.* § (a)(10). While the youngest child was apparently always a shy child and struggled in school, she seemed to find an outlet in athletic activities, which Mother was able to facilitate. *Id.* § (a)(2), (6). The child testified that she played several sports and Mother was very active in supporting those activities both through attendance and coaching. *Id.* Father, on the other hand, was unable to be as active in the child's extracurricular activities because of his work schedule, although he attended games when he could.

Dr. McMillan recommended that initially the youngest child's custody change from Mother to Father, but expressed hope that she would be able to be returned to Mother's primary care if Mother could be rehabilitated back into the role of primary residential parent. Dr. McMillan testified that it would be a lot of work for Mother, but that it would be "a fine outcome" and he hoped that would be the outcome. Dr. McMillan testified that, in addition to working on her parenting techniques and ability to co-parent with Father, Mother had many personal problems she needed to work on. *See* Tenn. Code. Ann. § 36-6-106(a)(5). While he was not able to provide a diagnosis on whether Mother was bipolar, he thought probably she was not. *Id.* Regardless, Mother's constant "chaotic raging and dramatic behavior" was something he believed she should seek professional assistance to correct either through medication or counseling. *Id.* Dr. McMillan noted that while he thought it would be positive for the youngest child to return to Mother's primary care if Mother improved, he did not believe the same regarding the middle child. When asked whether he preferred the sisters live with the same primary residential parent, Dr. McMillan said that they need not live together; that the most important factor was that each child lived with an effective parent and he hoped that Mother would work on her ability to be an effective parent for the youngest child and co-parent with Father.

We are mindful that "[t]rial courts are vested with wide discretion in matters of child custody" *Johnson*, 169 S.W.3d at 645 (quoting Koch, 874 S.W.2d at 575), because, among other things, "[c]ustody and visitation determinations often hinge on subtle factors," *Id.* (quoting Gaskill, 936 S.W.2d at 631), including the demeanor and credibility of the parties during the proceedings; consequently, "appellate courts 'are reluctant to second-guess a trial court's decisions.'" *Id.* In this case the trial court obviously considered Dr. McMillan's recommendation that the youngest child change custody, at least temporarily, from Mother to Father, but was ultimately swayed by other subtle factors in the case including the court's observation of this child during her testimony. Although the court departed from Dr. McMillan's ultimate recommendation on custody, the court accepted Dr. McMillan's recommendation that the youngest child receive counseling because the court found Dr. McMillan to be a credible witness. In so doing, the court also gave Mother a stern warning to seek counseling for herself in order to address her parenting and personal issues while there was still time for her to salvage her relationship with the youngest child. The court explained that it was "concerned if [Mother] continues in her current parenting skills, continues to utilize those same ways she has, that we will be back here again in a few years with [the youngest child]." Finding no error, we affirm the trial court's determination that it is in the best interest of the youngest child to remain in the primary care of Mother, but that the youngest child receive counseling.

## III. Child Support

Mother asserts that the trial court erred in not deviating upward when setting the amount of child support in this action. The April 2000 Agreed Order set child support for the three children at $5,000.00 per month, which was a deviation upward of approximately $900.00 per month from that as was required by the Child Support Guidelines. Following the entry of the order that forms the basis of this appeal, Mother filed a Motion to Alter or Amend seeking, *inter alia*, "a new trial on the issue of the amount of child support." Mother's motion was denied by the trial court and, on

appeal, she asks this Court to apply the same upward deviation to the current child support order as existed in the April 2000 Agreed Order or, in the alternative, for a hearing to determine if she is entitled to a deviation.

Because child support decisions retain an element of discretion, we review them using the deferential "abuse of discretion" standard. *Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005). This standard is a review-constraining standard of review that calls for less intense appellate review and, therefore, less likelihood that the trial court's decision will be reversed. *Id.* (citing *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000); *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222-23 (Tenn. Ct. App. 1999)). Discretionary decisions must, however, take the applicable law and the relevant facts into account. *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996).

The amount of support derived from a proper application of the formula in the Child Support Guidelines becomes the presumptive amount of child support owed. *Richardson*, 189 S.W.3d at 725 (Tenn. Ct. App. 2005). This amount of support, however, is rebuttable, Tenn.Code Ann. § 36-5-101(e)(1)(A); Tenn. Comp. R. & Regs. 1240-2-4-.01(1)(d)(1) (2008); *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005), and a trial court may, in its discretion, deviate from the amount of support required by the Child Support Guidelines. *State v. Wilson*, 132 S.W.3d 340, 343 (Tenn. 2004); *Jones v. Jones*, 930 S.W.2d 541, 545 (Tenn. 1996). Tenn. Code Ann. § 36-5-101(e)(1)(B) permits the court to deviate from the Child Support Guidelines "if the net income of the obligor exceeds ten thousand dollars ($10,000) per month;" however, the custodial parent "must prove, by a preponderance of the evidence, that child support in excess of the amount provided for in the child support guidelines is reasonably necessary to provide for the needs of the minor child or children of the parties." Tenn. Code Ann. § 36-5-101(e)(1)(B).

The trial court ordered child support to be calculated in accordance with the Guidelines. The court adopted the Permanent Parenting Plan and Child Support Worksheet, which resulted in Father paying $2,100.00 per month to Mother for the support of the youngest child. Mother then filed a Motion to Alter or Amend, *inter alia,* seeking a new trial on the issue of child support; she sought to put on proof with regard to whether an upward deviation was appropriate. In light of the modification of other provisions of the April 2000 Agreed Order, Mother is not correct that an upward deviation is automatic or that the amount of the deviation should be automatically continued. When seeking an upward deviation, the statute clearly places the burden on the custodial parent to "prove, by a preponderance of the evidence, that child support in excess of the amount provided for in the Guidelines was reasonably necessary to provide for the needs of the minor child left in her primary care." Tenn. Code Ann. § 36-5-101(e)(1)(B). Since Mother is the custodial parent of the youngest child and was awarded child support, she bears the burden of proving that an upward deviation is appropriate. When the trial court denied her motion, she did not have an opportunity to present such proof;[8] consequently, we reverse this action of the court and remand the case to the

---

[8] The order disposing of her Motion did not specify why the court denied the request for a hearing.

trial court for the limited purpose of determining whether an upward deviation from the Child Support Guidelines is appropriate.

## IV. Attorney's Fees

Both parties take issue with the trial court's denial of their respective requests for attorney's fees. Father asserts that because custody of the middle child was changed from Mother to Father that he is the prevailing party and entitled to an award of attorney's fees; Mother asserts that because custody of the youngest child was not changed that she is also a prevailing party and because Father has the ability to pay that she is entitled an award of attorney's fees.

There is no question that Tenn. Code Ann. § 36-5-103(c) empowers the courts to award reasonable attorney's fees incurred by persons who are required to return to court to enforce a child support order. The statute provides in relevant part:

> "the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any . . . suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, . . . at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court."

Tenn. Code Ann. § 36-5-103(c). The question of whether to award attorney's fees, and the amount thereof, are within the sound discretion of the trial court and we will not disturb the trial court's decision on appeal absent an abuse of discretion. *Id.*; *See Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005). An abuse of discretion occurs "only when the trial court applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003); *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn. 2001).

Both parties in this case were partially successful; thus, neither party is a clear winner. Under these circumstances, we do not find that the trial court abused its discretion by denying both parties' requests for attorney's fees; consequently, we affirm the denial of the requests.

## CONCLUSION

For the reasons set forth above, we affirm the judgment of trial court with respect to modification of custody and attorney's fees; we reverse the court's denial of a hearing on Mother's request for a hearing on the amount of child support and remand the issue of child support to the trial court for the purpose of determining whether Mother is entitled to an upward deviation from the Child Support Guidelines. Costs are assessed to the parties equally, for which execution may issue, if necessary.

 

_____
RICHARD H. DINKINS, JUDGE